UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SHARON BRANEN, Individually and on Behalf of All Others Similarly Situated, ) ) )<br><br>Plaintiff, )<br>)<br>)<br>vs. )<br>)<br>J. JILL, INC., PAULA BENNETT, DAVID )<br>BIESE, MICHAEL RAHAMIM, ANDREW )<br>ROLFE, TRAVIS NELSON, MARKA )<br>HANSEN, MICHAEL ECK, MICHAEL )<br>RECHT, MERRILL LYNCH, PIERCE, )<br>FENNER & SMITH INCORPORATED, )<br>MORGAN STANLEY & CO. LLC, )<br>JEFFERIES LLC and TOWERBROOK )<br>CAPITAL PARTNERS L.P., )<br>)<br>Defendants. )<br>)<br>)<br>_____ ) | No.<br><br><u>CLASS ACTION</u><br><br>COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933<br><br><br><br><br><br><br><br><br><br><br><br><br><br><u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Sharon Branen ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by J.Jill, Inc. ("J.Jill" or the "Company"), Company press releases, analyst reports on the Company, and media reports and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons who purchased shares of J.Jill common stock in or traceable to the Company's March 9, 2017 initial public offering (the "IPO") seeking to pursue remedies under the Securities Act of 1933 (the "1933 Act").

2.      Defendant J.Jill is a specialty apparel brand focused on affluent women in the 40 to 65 age segment.  It employs an "omni-channel" sales and marketing platform, whereby it sells its products through a variety of sales channels, including brick-and-mortar retail stores, a sales catalog and the Company's website.

3.      In connection with the IPO, defendants marketed J.Jill as insulated from adverse trends impacting the larger retail sector.  For example, the Registration Statement, which incorporated the Prospectus, for the Company's IPO (the "Registration Statement") stated that the Company's "customer-focused strategy, foundational investments and data insights have resulted in consistent, profitable growth" and would "continue to drive profitable sales growth over time."

4.      The Registration Statement was negligently prepared and as a result contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein

not misleading, and failed to make adequate disclosures required under the rules and regulations governing its preparation.

5.    Specifically, the Registration Statement failed to disclose, *inter alia*: (i) that J.Jill's purportedly unique and superior sales and marketing approach had not insulated the Company from adverse trends affecting the overall retail industry; (ii) that J.Jill's historic gross margin growth was not sustainable and would not continue, as it relied on revenues from shipping fees, increased promotional efforts and other short-term boosts to revenues; (iii) that the Company was carrying increasing amounts of slow moving inventory and would need to significantly markdown sales items and increase promotional efforts in an attempt to continue its sales growth; (iv) that the Company's brick-and-mortar stores were failing, as they were experiencing difficulty attracting customers and maintaining profitability, which would result in the Company shuttering up to eight stores in fiscal 2017, with the rate of store closures accelerating; and (v) that J.Jill's business, prospects and ability to service its long-term debt had been materially impaired.

6.    On October 12, 2017, J.Jill common stock closed at $4.86 per share, or more than 62% below its offering price only seven months after the IPO.

## JURISDICTION AND VENUE

7.    The claims alleged herein arise under §§11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

8.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

9.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because defendants maintain an office in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff Sharon Branen acquired shares of J.Jill common stock pursuant and/or traceable to the IPO as described in the Certification attached hereto and incorporated by reference, and has been damaged thereby.

12.     Defendant J.Jill is a specialty women's apparel retailer headquartered in Quincy, Massachusetts.  It was the registrant and issuer for the stock sold in the IPO, and its stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "JILL."

13.     Defendant Paula Bennett ("Bennett") was President, Chief Executive Officer ("CEO") and a director of the Company at the time of the IPO.

14.     Defendant David Biese ("Biese") was Chief Financial Officer ("CFO") and a Senior Vice President of the Company at the time of the IPO.

15.     Defendant Michael Rahamim ("Rahamim") and was the Chairman of the Board of Directors of J.Jill ("the "Board") at the time of the IPO.

16.     Defendant Andrew Rolfe was a director and member of the Board at the time of the IPO.

17.     Defendant Travis Nelson was a director and member of the Board at the time of the IPO.

18.     Defendant Marka Hansen was a director and member of the Board at the time of the IPO.

19.     Defendant Michael Eck was a director and member of the Board at the time of the IPO.

20.     Defendant Michael Recht was a director and member of the Board at the time of the IPO.

21.     The defendants identified in ¶¶13-20 are referred to herein as the "Individual Defendants." The Individual Defendants signed the Registration Statement and, as directors and/or executive officers of the Company, participated in the solicitation and sale of J.Jill common stock to investors in the IPO for their own benefit and the benefit of J.Jill.

22.     Defendants Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. LLC and Jefferies LLC (collectively referred to as the "Underwriter Defendants") served as underwriters for the IPO and sold million shares of J.Jill common stock in the IPO, for which they received certain fees and commissions.

23.     The Underwriter Defendants drafted and disseminated the Registration Statement. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

24.     Defendant TowerBrook Capital Partners L.P. (together with its investment vehicles and funds, "TowerBrook") was the private equity sponsor of the IPO and sold its shares in the IPO. As detailed in the Registration Statement, TowerBrook controlled J.Jill both before and after the IPO. Specifically, the Registration Statement admits that:

> We continue to be controlled by TowerBrook . . . .
>
> Following this offering, TowerBrook will own 60% of our common equity (or 57% if the underwriters exercise their option to purchase additional shares in full). In addition, representatives of TowerBrook comprise a majority of our directors. As a result, TowerBrook will have effective control over the outcome of votes on all matters requiring approval by our stockholders, including entering into significant corporate transactions such as mergers, tender offers and the sale of all or substantially all of our assets and issuance of additional debt or equity. In addition, as long as TowerBrook beneficially owns at least 50% of our common stock, the Stockholders Agreement will provide TowerBrook with veto rights with respect to certain material matters.

## SUBSTANTIVE ALLEGATIONS

25.     Defendant J.Jill is a specialty apparel company focused on affluent women ages 40 to 65. The Company employs an omni-channel marketing and sales platform, whereby the Company sells its products via a mix of retail stores and a Company catalog and website.

26.     In May 2015, private equity firm TowerBrook acquired J.Jill from another private equity firm, Golden Gate Capital LP, in a deal reportedly valued at $400 million. In the lead up to the IPO, TowerBrook increased the Company's debt load purportedly to boost sales and fund improvements to J.Jill's sales and marketing operations, including an enhancement of J.Jill's online sales capabilities. In the months leading up to the IPO, J.Jill's long-term debt had increased to $274 million, or tens of millions of dollars more than its pre-buyout leverage. This compares to net income for the Company of approximately $10.3 million for the fiscal year ended January 31, 2015. Part of the reason for this debt increase was a $70 million dividend J.Jill paid to partners of an investment vehicle affiliated with TowerBrook in May 2016.

27.     While companies may ordinarily use an initial public offering to raise proceeds that could be used to pay down debt, none of the proceeds for the IPO were to go to J.Jill. Instead, the proceeds from the IPO would go entirely to TowerBrook, generating more than $151 million in gross proceeds for the private equity firm. As a result, it was imperative to investors that the Company continue to grow its profit margins in order to service J.Jill's sizeable debt.

28.     By the end of 2016, many traditional retailers were experiencing declining sales and increased pressure on their profit margins as a result of increased competition from online and discount retailers. Brick-and-mortar retailers such as Macy's and Sears announced hundreds of store closings in 2016, while others, such as the Sports Authority and Aeropostale, went bankrupt.

29.     J.Jill represented that it had insulated itself from these larger trends by way of its business strategies and competitive advantages. Specifically, the Company touted its unique omni-

channel business model (which was purportedly growing the Company's online sales presence), dedicated consumer base, and "industry-leading" data-centric approach. For the twelve months ended October 29, 2016, about 42% of J.Jill's net sales came from its direct channels and about 58% came from its retail channels. Within the direct channels, sales through e-commerce sites accounted for approximately 88% of net sales and catalog orders represented about 12% of net sales. J.Jill stated that it planned to increase its proportion of direct sales, including e-commerce, to approximately 50% of the Company's total net sales following the IPO. J.Jill also characterized its customer base as "highly loyal" and "engaged" and stated that the overwhelming majority of its customers (70%) had shopped with the Company for at least five years. With respect to J.Jill's data capabilities, the Company represented that its state-of-the-art data collection efforts and customer tracking allowed it to match approximately 97% of transactions to an identifiable customer. This massive collection of information purportedly allowed J.Jill to target and engage specific customers and ultimately grow sales and increase profits even in a turbulent operating environment.

30.     Leading up to the IPO, it appeared that J.Jill's strategy was working. The Company stated that its total net sales had grown from $432 million in fiscal year 2012 to $562 million in pro forma fiscal year 2015, reflecting a 9% compound annual growth rate ("CAGR"), and to $617 million for the twelve months ended October 29, 2016, reflecting an accelerating 10% CAGR in the months leading up to the IPO. J.Jill also stated that it was experiencing steady gross profit and gross margin growth. For fiscal 2014, J.Jill stated its gross profit increased to $318.6 million from $294.8 million the prior year, while gross margin increased to 65.9% from 64.6% year-over-year. For pro forma 2015, gross profit increased again to $373.2 million, with a corresponding increase in gross margin to 66.4%. The reasons J.Jill gave for this consistent growth in gross margins included improved operating efficiencies and a reduction in promotional markdowns.

31.     On or about February 10, 2017, the Company filed with the SEC a registration statement on Form S-1 for the IPO, which was amended on February 27, 2017 and declared effective on March 8, 2017 (together with all amendments, the "Registration Statement").  The next day, the Company filed the prospectus for the IPO on Form 424B4, which incorporated and formed part of the Registration Statement (the "Prospectus").  Together, the Registration Statement and Prospectus were used to sell to the investing public approximately 12.5 million shares of J.Jill common stock in the IPO at $13 per share.

32.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

33.     Specifically, the Registration Statement created the misleading impression that the Company's unique business strategy had insulated it from adverse industry trends and, as a result, J.Jill would be able to continue to grow its gross profits.  For example, the Registration Statement stated that the Company's "customer-focused strategy, foundational investments and data insights have resulted in ***consistent, profitable growth***" and emphasized "***we believe we will continue to drive profitable sales growth over time***."

34.     The Registration Statement repeatedly highlighted J.Jill's "sustainable" and "consistent" growth in the quarters leading up to the IPO and represented that these growth trends would continue, stating in pertinent part:

> ***We have established a solid foundation to support long-term, sustainable growth*** by investing to build our team, market our brand and enhance our systems, distribution center and data insight capabilities.  Net income in pro forma fiscal year 2015 was $14.3 million.  ***We believe our customer-focused strategy, foundational investments and data insights have resulted in consistent, profitable growth and industry-leading Adjusted EBITDA margins*** of 14.6% in pro forma fiscal year

2015.  For a reconciliation of our Adjusted EBITDA to our net income, please see "Prospectus Summary—Summary Consolidated Historical and Pro Forma Financial and Other Data." Recent financial highlights include:

- Total net sales growth from $432 million in fiscal year 2012, to $562 million in pro forma fiscal year 2015, reflecting a 9% compound annual growth rate ("CAGR"), and to $617 million for the twelve months ended October 29, 2016, reflecting a 10% CAGR;

- Positive total company comparable sales growth in 17 of the last 19 consecutive quarters, including in each of the last ten consecutive quarters;

- Net income growth from a loss of $3.6 million in fiscal year 2012, to $14.3 million in pro forma fiscal year 2015 and to $23.5 million for the twelve months ended October 29, 2016;

- Net income margin expansion of 330 basis points, from (0.8%) in fiscal year 2012, to 2.5% in pro forma fiscal year 2015, and of 460 basis points to 3.8% for the twelve months ended October 29, 2016;

- 19 consecutive quarters of positive Adjusted EBITDA growth;

- Adjusted EBITDA growth from $44 million in fiscal year 2012, to $82 million in pro forma fiscal year 2015, reflecting a 23% CAGR, and to $99 million for the twelve months ended October 29, 2016, reflecting a 24% CAGR; and

- Adjusted EBITDA margin expansion of 440 basis points, from 10.2% in fiscal year 2012, to 14.6% in pro forma fiscal year 2015, and of 580 basis points to 16.0% for the twelve months ended October 29, 2016.

35.     Similarly, the Registration Statement represented that the target demographic for the Company's product made it unlikely that its customers would switch to competing brands.  The Registration Statement stated that J.Jill was "focused on *a loyal, engaged and affluent customer* in the attractive 40-65 age segment."  According to the Registration Statement, J.Jill's typical customer was "*highly loyal*, as evidenced by the fact that approximately 70% of [J.Jill's] gross sales in pro forma fiscal year 2015 came from customers that have been shopping with J.Jill for at least five years."  According to the Registration Statement, these customers "spend nearly twice as much and shop with [J.Jill] 1.5 times more per year than a new-to-brand customer."  The Registration Statement listed as a "competitive strength" J.Jill's "commitment to [its] customer and [its] brand

building activities," which they stated had "created significant brand trust and an emotional connection with [the Company's] customers that [it] believe[s] *will facilitate sustainable sales growth and market share gains over time. . . . We believe we will continue to develop long-term customer relationships that will drive profitable sales growth*."

36.     The Registration Statement also stated that J.Jill's omni-channel business model was "*highly profitable*" and "allows [it] to drive customer response and purchasing behavior in all channels."   J.Jill used this "powerful" multi-pronged sales model to "leverage [its] targeted marketing initiatives to acquire new customers across all channels."  As to the retail channel, the Registration Statement stated that the Company's stores "*have produced strong and consistent performance*, with 98% of [its] full-price locations generating positive 4-wall contribution in pro forma fiscal year 2015."   The Registration Statement also highlighted the Company's "new store design" and stated that new stores were paid back on average in two years.   Similarly, the Registration Statement stated that the Company's direct channels had been *growing* "*rapidly*" and "accounted for 42% of net sales for the twelve months ended October 29, 2016," thereby bolstering the Company's apparent competitiveness with online retailers.  These cross-channels customers were also purportedly growing overall sales: "On average, [J.Jill's] omni-channel customers purchase on nearly three more occasions per year and spend nearly three more times per year than [its] single-channel customers."

37.     The Registration Statement listed as another "competitive advantage" J.Jill's *"Data-Centric Approach That Drives Consistent Profitability and Mitigates Risk.*"  The Registration Statement stated that J.Jill's "*industry-leading customer database* allows [it] to match approximately 97% of transactions to an identifiable customer."  As a result of this "data-centric approach," J.Jill could purportedly "leverage [its] database and apply [its] insights to manage [its]

business as well as to acquire and engage customers to drive optimum value and productivity." The Registration Statement also stated that "*it is [J.Jill's] use of the data that distinguishes [it] from [its] competitors*," and that it believed its data capture capabilities were "*significantly ahead of the industry standard*." The Registration Statement stated in pertinent part:

> We maintain an extensive customer database that tracks customer details from personal identifiers and demographic overlay (e.g., name, address, age and household income) and transaction history (e.g., orders, returns and order value). We continually leverage this database and apply our insights to operate our business as well as to acquire new customers and then create, build and maintain a relationship with each customer to drive optimum value. For example, in pro forma fiscal year 2015 we utilized insights from our data to expand our marketing investment and focus our initiatives to emphasize customer acquisition. This drove growth in active customers by 12% and new customers by 15%. We also increased spend per customer by 6% as customers purchased more frequently and spent more per transaction. *We believe our data-centric approach allows us to respond to customer preferences and mitigate risk leading to consistent, predictable operating and financial performance over time.*

38.     The Registration Statement stated that this "extensive database" of customer feedback allowed J.Jill "to identify and incorporate changes in [its] customers' preferences, *mitigating fashion risk.*" The Registration Statement also stated: "We believe our customer focused approach to product development and continual delivery of fresh, high quality products *drives traffic, frequency and conversion*." In addition, the Registration Statement claimed, "We believe our merchandising strategy, flow of fresh, new styles and ability to integrate continuous customer feedback and purchasing data *allow us to consistently deliver relevant products to our customers.*" The Registration Statement also stated that "effective inventory management practices" made J.Jill "*able to minimize markdowns and promotional activity, allowing [it] to drive favorable gross margins.*"

39.     In addition, the Registration Statement provided a list of "business growth strategies" that would continue to drive sales and profits following the IPO. The Registration Statement stated in pertinent part:

*Grow Size and Value of Our Active Customer Base*.  We have a significant opportunity *to continue to attract new customers to our brand and to grow the size and value of our active customer base across all channels*.  Historically, we grew our business by driving spend per customer.  We strategically increased our marketing investment to drive growth through the acquisition of new customers, reactivation of lapsed customers and the retention of existing customers.  This investment has proven effective as, for example, in fiscal year 2015 we increased our marketing investment by 16%, resulting in active customer base growth of 12%, including new customer growth of 15%.  We also experienced an increase in spend per customer by 6% as customers purchased more frequently and spent more per transaction.  In addition, in fiscal year 2015, the number of our omni-channel customers, who purchase on nearly three more occasions per year and spend nearly three more times per year than our single-channel customers, increased by 21%.  We recently began a brand voice and customer segmentation initiative which, upon completion, will further enhance our ability to target the highest value customers and increase customer spending.  *Through these initiatives, we believe we will continue to attract new customers to our brand, migrate customers from single-channel to more profitable omni-channel customers and increase overall customer retention and spend*.

*Increase Direct Sales.  Given our strong foundation that positions us to capitalize on the growth of online and mobile shopping, we believe we have the opportunity to grow our direct sales from 42% of our net sales to approximately 50% over the next few years.*  According to Euromonitor, online apparel sales are expected to grow at a CAGR of approximately 15% from 2015 to 2020, which is significantly above the long-term growth of the broader apparel industry.  We are undertaking several initiatives to enhance our capabilities and drive additional direct sales.  We are in the process of re-platforming our website to improve our customers' personalized shopping experience and increase the ease of navigation, checkout and overall engagement.  Our new platform, managed by our experienced team, will provide us with the opportunity to expand internationally.  In addition, our mobile platform provides us with the ability to effectively engage with our customer on her mobile device by providing her with access to product research and the ability to connect with the brand socially.  *We believe our powerful direct platform will enable us to further strengthen our dominant market position and broaden our customer reach*.

*Profitably Expand Our Store Base.  Based on our proven new store economics, we believe that we have the potential to grow our store base by up to 100 stores over the long term from our total of 275 stores as of January 28, 2017*.  We will target new locations in lifestyle centers and premium malls, and we plan to open 10-15 new stores in fiscal year 2017 and in each year thereafter.  Our new store model targets an average of approximately $1.0 million of net sales per store and approximately $270,000 of 4-wall contribution within the first full year of operations.  We introduced a new store design concept in 2013 that showcases our brand concept and elevates, yet simplifies the J.Jill shopping experience.  The new store concept provides a welcoming, easy-to-shop format that guides her through

clearly merchandised product stories.  All of our new and refreshed stores will reflect our new design concept.  *We also plan to selectively close underperforming stores on an annual basis, including one in 2016*.

*Strengthen Omni-Channel Capabilities.*  We are pursuing a variety of initiatives designed to enhance our omni-channel capabilities focused on best serving our customer, wherever and whenever she chooses to shop.  We have recently enhanced our management team to focus on the omni-channel customer experience, including the recent hires of a Chief Information Officer and a Senior Vice President of Marketing.  We will continue to leverage our insight into customer attributes and behavior, which will guide strategic investments in our business.  For example, we will enhance our ability to seamlessly manage our inventory across all of our channels.  We also plan to implement technology to further fulfill customer demand, including ship from store to customer and order online for pickup in store.  *We expect our sustainable model, combined with our omni-channel initiatives, will continue to drive traffic, increase average transaction value and enhance conversion across all of our channels.*

*Enhance Product Assortment.*  We believe there is an opportunity to grow our business by selectively broadening and enhancing our assortment in certain product categories, including our Pure Jill and Wearever sub-brands, our Women's and Petite's businesses, and accessories.  Based on strong demand for our extended size product and our sub-brands, we believe we have the opportunity to expand and focus these categories in selected stores as well as test the offering in stand-alone store formats.  We also believe we have the opportunity to continue to optimize our assortment architecture and productivity by delivering the right mix and flow of fashion and basics to our channels.  In addition, we will continue delivering high quality customer focused product assortments across each of our channels, while strengthening visual merchandising.  *Through our focused and enhanced product offering, particularly in our sub-brands and extended sizes, we believe we will continue to drive profitable sales growth over time.*

40.     The Registration Statement also made several statements about the Company's increasing gross profits and profit margins, which were purportedly due to factors such as improved "supply chain efficiencies" and reduced "promotional markdowns," including the following:

Gross profit was $322.5 million for the thirty-nine weeks ended October 29, 2016, compared to $97.7 million for the 2015 Predecessor Period and $173.6 million for the 2015 Interim Successor Period.  This increase was primarily due to an increase in net sales, partially offset by an increase in cost of goods sold resulting from amortizing the increase in the fair value of merchandise inventory in the 2015 Interim Successor Period as a result of the application of purchase accounting.

*        *        *

Gross profit was $97.7 million for the 2015 Predecessor Period and $265.0 million for the 2015 Successor Period, compared to $318.6 million for fiscal year 2014. The increase was primarily due to an increase in net sales partially offset by an increase in cost of goods sold during the 2015 Successor Period resulting from the amortization of the step-up to fair value of merchandise inventory resulting from the application of a purchase accounting adjustment related to the Acquisition.

\* \* \*

Gross profit for pro forma fiscal year 2015 increased $54.6 million, or 17.1%, to $373.2 million, from $318.6 million for fiscal year 2014. This increase was due primarily to the increase in net sales of 16.3%. The balance of the increase reflects gross margin for pro forma fiscal year 2015 increasing to 66.4% from 65.9% for fiscal year 2014. The increased gross margin was primarily due to supply chain efficiencies.

\* \* \*

Gross profit for fiscal year 2014 increased $23.8 million, or 8.1%, to $318.6 million, from $294.8 million for fiscal year 2013. This increase was due primarily to the increase in net sales of 6.0%. The balance of the increase reflects gross margin for fiscal year 2014 increasing to 65.9% from 64.6% for fiscal year 2013. The increased gross margin was primarily due to a reduction in promotional markdowns.

41.     The statements in ¶¶33-40 were materially false and misleading when made because they failed to disclose:

(a)     that J.Jill's purportedly unique and superior sales and marketing approach had not insulated the Company from adverse trends affecting the overall retail industry;

(b)     that J.Jill's historic gross margin growth was not sustainable and would not continue, as it relied on revenues from shipping fees, increased promotional efforts and other short-term boosts to revenues;

(c)     that the Company was carrying increasing amounts of slow moving inventory and would need to significantly markdown sales items and increase promotional efforts in an attempt to continue its sales growth;

- 13 -

(d)      that the Company's brick-and-mortar stores were failing, as they were experiencing difficulty attracting customers and maintaining profitability, which would result in the Company shuttering up to eight stores in fiscal 2017, with the rate of store closures accelerating; and

(e)      that, as a result of (a)-(d) above, J.Jill's business, prospects and ability to service its long-term debt had been materially impaired.

42.      Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii), requires defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   Similarly, Item 503 of SEC Regulation S-K, 17 C.F.R. §229.503, requires, in the "Risk Factor" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk."   The failure of the Registration Statement to disclose that the Company's purportedly unique business strategy had not insulated J.Jill from adverse trends affecting the wider industry, that the Company would in fact have to increase promotions and markdowns to continue the rate of sales growth, and that J.Jill would have to shutter up to eight times the number of stores closed in fiscal 2016 in the months following the IPO – thereby diminishing the Company's gross margins and impairing its ability to service its long-term debt – violated 17 C.F.R. §229.303(a)(3)(ii), because these undisclosed facts would (and did) have an unfavorable impact on the Company's sales, revenues and income from continuing operations. This failure also violated 17 C.F.R. §229.503 because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in shares of J.Jill common stock speculative or risky.

- 14 -

43.      On October 12, 2017, J.Jill stock closed at $4.86 per share.  This price represented a greater than *62% decline* from the price at which J.Jill stock had been sold to the investing public only seven months earlier.

## CLASS ACTION ALLEGATIONS

44.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired J.Jill common stock pursuant and/or traceable to the false and misleading Registration Statement (Registration No. 333-215993) issued in connection with the Company's IPO conducted on or about March 9, 2017 (the "Class").  Excluded from the Class are defendants and their families, the officers, directors and affiliates of the defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

45.      The members of the Class are so numerous that joinder of all members is impracticable.  J.Jill stock is actively traded on the NYSE and millions of shares were sold in the IPO.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by J.Jill or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  As of September 12, 2017, J.Jill had more than 43.7 million shares of stock outstanding.

46.      Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

47.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

48.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the 1933 Act;

(b)     whether statements made by defendants to the investing public in the Registration Statement misrepresented material facts about the business and operations of J.Jill; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

49.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violations of §11 of the 1933 Act
### Against All Defendants Except TowerBrook

50.     Plaintiff repeats and realleges ¶¶1-49 by reference.

51.     This Count is brought pursuant to §11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants except TowerBrook.

52.     This Count does not sound in fraud.  Plaintiff does not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a §11 claim.

- 16 -

53.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

54.     J.Jill is the registrant for the IPO.  The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

55.     As issuer of the shares, J.Jill is strictly liable to plaintiff and the Class for the misstatements and omissions.

56.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

57.     By reason of the conduct alleged herein, each defendant violated, and/or controlled a person who violated, §11 of the 1933 Act.

58.     Plaintiff acquired J.Jill common stock pursuant and/or traceable to the Registration Statement for the IPO.

59.     Plaintiff and the Class have sustained damages.  The value of J.Jill common stock has declined substantially subsequent to and due to defendants' violations.

60.     At the time of their purchases of J.Jill common stock, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff filed this complaint. Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff filed this complaint.

- 17 -

## COUNT II

### For Violation of §15 of the 1933 Act
### Against J.Jill, the Individual Defendants and TowerBrook

61.     Plaintiff repeats and realleges ¶¶1-60 by reference.

62.     This Count is brought pursuant to §15 of the 1933 Act against J.Jill, the Individual Defendants and TowerBrook.

63.     The Individual Defendants each were control persons of J.Jill by virtue of their positions as directors and/or senior officers of J.Jill.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of J.Jill.  The Company controlled the Individual Defendants and all of its employees.

64.     TowerBrook had control over J.Jill at the time of the IPO, and continues to have control over the Company, by virtue of its control over a majority of the voting stock of the Company and a majority of the Company's Board of Directors and certain rights provided to it pursuant to a Stockholders Agreement.  The Registration Statement states that J.Jill is a controlled company that is controlled by TowerBrook.  TowerBrook also reaped profits from its sale of millions of shares of J.Jill stock in the IPO.

65.     The defendants named herein each were culpable participants in the violations of §11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process that allowed the IPO to be successfully completed.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of the plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  October 13, 2017                    HUTCHINGS BARSAMIAN MANDELCORN, LLP
                                            THEODORE M. HESS-MAHAN, BBO #557109


                                            /s/Theodore M. Hess-Mahan
                                            THEODORE M. HESS-MAHAN

                                            110 Cedar Street, Suite 250
                                            Wellesley Hills, MA  02481
                                            Telephone:  781/431-2231
                                            781/431-8726 (fax)
                                            thess-mahan@hutchingsbarsamian.com

                                            ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID C. WALTON
BRIAN E. COCHRAN
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

JOHNSON FISTEL, LLP
FRANK J. JOHNSON
600 West Broadway, Suite 1540
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)

JOHNSON FISTEL, LLP
MICHAEL I. FISTEL, JR.
40 Powder Springs Street
Marietta, GA  30064
Telephone:  770/200-3104
770/200-3101 (fax)

Attorneys for Plaintiff

I:\Admin\CptDraft\Securities\CPT J.Jill_fd.docx