UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE PENSION TRUST (LEAD PLAINTIFF)<br><br>Plaintiff,<br><br>v.<br><br>J.JILL, INC. *et al.*,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:17-cv-11980-LTS<br>)<br>)<br>)<br>)<br>) |

ORDER ON MOTIONS TO DISMISS (DOCS. NO. 44, 46)

December 20, 2018

SOROKIN, J.

Now pending before the Court are two motions to dismiss the Amended Complaint, Doc. No. 40. One was filed by the "Company Defendants": J.Jill Inc. ("J.Jill"), TowerBrook Capital Partners L.P. ("TowerBrook"), Paula Bennett, David Biese, Michael Rahamim, Andrew Rolfe, Travis Nelson, Marka Hansen, Michael Eck, and Michael Recht. Doc. No. 44. The other was filed by the "Underwriter Defendants": Merrill Lynch, Pierce, Fenner & Smith Incorporated, Morgan Stanley & Co. LLC, and Jefferies LLC. Doc. No. 46. For the reasons that follow, both motions to dismiss are ALLOWED.

I. BACKGROUND

J.Jill is a women's clothing brand with "an 'omni-channel' sales and marketing platform, whereby it sells its products through a variety of sales channels, including brick-and-mortar retail stores, a sales catalog and the Company's website." Doc. No. 40 ¶ 16. In May 2015,

TowerBrook purchased J.Jill.  Id. ¶ 19.  In February 2017, J.Jill filed a Registration Statement and Prospectus with the Securities and Exchange Commission ("SEC") in preparation for its upcoming initial public offering ("IPO").  Id. ¶ 25.  J.Jill held its IPO on March 9, 2017, id. ¶ 1, selling approximately 12.5 million shares at $13 per share, id. ¶ 25.

At the end of May 2017, "J.Jill announced its financial results for the first fiscal quarter of 2017," reporting that "total net sales had increased by 12.5% to $166.1 million, while its total comparable store sales had increased by approximately 9.9%, and the Company's gross margin had increased to 69.6% for the quarter." Id. ¶ 42.  However, J.Jill "provided surprisingly conservative guidance for the remainder of the year." Id.  It predicted "total comparable store sales to increase in the high single digits for the year, which implied a deceleration in the Company's sales growth." Id.  Its report indicated that J.Jill's "growth margin rate was expected to decline for the remainder of the year." Id.

On an earnings conference call held the same day to discuss the reported results, a UBS analyst "expressed 'puzzlement' at the new expectations for the remainder of the year provided by the Company." Id. ¶ 43.  The analyst said, "it kind of leaves the back half of the year part of the puzzle lower than what we spoke to – lower than what you spoke to when you gave us the components during the IPO." Id.  In response, J.Jill's Chief Financial Officer ("CFO"), David Biese, "admitted that 'the math isn't perfect' and stated that nothing had changed from the conditions impacting the Company's growth and prospects at the time of the IPO." Id.  He said, "I would tell you that we don't feel differently about the back half of the year . . . I don't see that there is anything different about the second half." Id.

On another earnings call held in August 2017 to discuss the results of the second fiscal quarter of 2017, "management for J.Jill revealed that competitive pressures had forced the

Company to take higher markdowns and increase promotional activities." Id. ¶ 45. Similarly, analysts on the call "expressed concern about the additional store closures, which would bring the total store closures to seven or eight for the year compared to just one in fiscal year 2016, and the ability of the Company to service its sizeable debt given the slowdown in profit growth." Id. The plaintiff asserts that on the call, J.Jill's Chief Executive Officer ("CEO"), Paula Bennett, "admitted that the Company's already disappointing margin guidance for the quarter had been 'too optimistic.'" Id.

On "October 11, 2017, J.Jill issued a press release updating its guidance for the third quarter." Id. ¶ 46. In this press release, Bennett stated:

> We have experienced a lower than expected sales trend across both our retail and direct channels, and are updating our guidance for the quarter. We have been assessing the change in trend and have identified product and marketing calendar issues that are affecting traffic and conversion, and we are reacting quickly.

Id. The press release also reported that J.Jill "expected total company comparable sales of -3% to -5% with a moderate decline in gross margin as compared to last year." Id. ¶ 47. The plaintiff filed suit on October 13, 2017, at which time J.Jill stock closed at $5.11 per share. Id. ¶ 48. The amended complaint, Doc. No. 40, alleges three counts under the Securities Act of 1933, 15 U.S.C. § 77: (1) a violation of § 11 against all defendants except TowerBrook, (2) a violation of § 12(a)(2) against all defendants, and (3) a violation of § 15 against the Company Defendants.

The Court consolidated three related cases against the Defendants in December 2017 and appointed the Oregon Laborers Employers Pension Trust Fund as lead plaintiff. Doc. No. 28. Now pending are two motions to dismiss, one filed by the Company Defendants, Doc. No. 44, and the other filed by the Underwriter Defendants, Doc. No. 46.

II. LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The court "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Court "may augment these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citing In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). The Court draws all reasonable inferences in the plaintiff's favor in resolving the pending motions to dismiss, and has before it: (1) the Registration Statement, Doc. No. 45-1, (2) the Prospectus, Doc. No. 45-2, and (3) a Transcript of the May 31, 2017 Earnings Call for J.Jill Inc., Doc. No. 57-1.[1]

---

[1] "Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33–34 (1st Cir. 2001). However, there is "a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993)). When "a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)." Beddall v. State St. Bank & Tr. Co., 137 F.3d 12, 17 (1st Cir. 1998). In this case, the complaint, Doc. No. 40, quotes extensively from both the Registration Statement and Prospectus; indeed, the plaintiff's claims that the two documents contained untrue statements of material fact and material omissions are necessarily dependent upon the Registration Statement and Prospectus. Furthermore, the complaint quotes substantial portions of an earnings call made on May 31, 2017. Doc. No. 40 ¶¶ 42-43. The plaintiff quoted

Section 11 of the Securities Act of 1933 imposes liability in cases where "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Similarly, § 12(a)(2) imposes liability in cases where a prospectus or oral communication "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." Id. § 77l(a)(2). "Claims under sections 11 and 12(a)(2) are therefore Securities Act siblings with roughly parallel elements" and often present two central issues: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359-60 (2d Cir. 2010).

The First Circuit has held that "an actionable § 11 omission may arise when a registration statement fails to comply with Item 303 or 503 of SEC Regulation S-K." Silverstrand Investments v. AMAG Pharm., Inc., 707 F.3d 95, 102 (1st Cir. 2013) (citing Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1202 n.3 (1st Cir. 1996)). Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). To survive a motion to dismiss on a failure to

---

select statements from the earnings call in the complaint as evidence of § 11 and § 12(a)(2) violations but did not include the full question and answer nor a transcript of the call. Defendants argue that, when considered in context, the statements cited in the complaint do not support the inference the plaintiff suggests they do. Doc. No. 56 at 12. The Company Defendants attached a transcript of the earnings call, Doc. No. 57-1, to their Reply Brief, Doc. No. 56. The plaintiff has not objected to the authenticity of the transcript nor moved to strike it from the record for purposes of the motions to dismiss. Therefore, the Court may properly consider the Registration Statement, the Prospectus, and the transcript of the earnings call in resolving the pending motions to dismiss.

disclose theory, "a complaint must allege (1) that a registrant knew about an uncertainty before an offering; (2) that the known uncertainty is reasonably likely to have material effects on the registrant's financial condition or results of operation; and (3) that the offering documents failed to disclose the known uncertainty." Silverstrand, 707 F.3d at 103 (internal quotation marks and citation omitted).

Additionally, Item 503 requires that a prospectus "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503.  Therefore, to survive 12(b)(6) dismissal, the complaint must "allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely [a]ffect the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor." Silverstrand, 707 F.3d at 103.

However, the Supreme Court has held that in the context of § 11, "a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless whether an investor can ultimately prove the belief wrong." Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1327 (2015).  For opinion statements, § 11 liability may attach in three cases: 1) "if the speaker did not hold the belief she professed," id., 2) "if the supporting fact she supplied [was] untrue," id., and 3) "if a registration statement omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself," id. at 1329.  However, "[t]he reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading." Id. at 1330.  To successfully plead a § 11 claim, the plaintiff therefore

must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

Id. at 1332.

### III.   DISCUSSION

The plaintiff alleges that the Registration Statement "contained untrue statements of material fact and omitted to disclose material information that was required to be disclosed pursuant to the regulations governing its preparation." Doc. No. 40 ¶ 26. However, the complaint does not identify any statements in either the Registration Statement or Prospectus which the plaintiff asserts were factually untrue. Rather, the complaint asserts that the Registration Statement "created the misleading impression that the Company's unique business strategy had insulated it from adverse industry trends." Id. ¶ 27. Therefore, the complaint alleges an actionable omission based on the failure to disclose five statements:

> (i) that J.Jill's purportedly unique and superior sales and marketing approach had not insulated the Company from adverse trends affecting the overall retail industry; (ii) that J.Jill's historic gross margin growth was not sustainable and would not continue, as it relied on revenues from shipping fees, increased promotional efforts and other short-term boosts to revenues; (iii) that the Company was carrying increasing amounts of slow moving inventory and would need to significantly mark down sales items and increase promotional efforts in an attempt to continue its sales growth; (iv) that the Company's brick-and-mortar stores were failing, as they were experiencing difficulty attracting customers and maintaining profitability, which would result in the Company shuttering up to eight stores in fiscal year 2017, with the rate of store closures accelerating; and (v) that J.Jill's business, prospects and ability to service its long-term debt had been materially impaired.

Id. Using virtually the same language, the complaint alleges that the Registration Statement and Prospectus violated Items 303 and 503 by failing to disclose:

> (i) that the Company's purportedly unique business strategy had not insulated J.Jill from adverse trends affecting the wider industry; (ii) that the Company would in fact have to increase promotions and markdowns to continue the rate of sales

growth; and (iii) that J.Jill would have to shutter up to eight times the number of stores closed in fiscal year 2016 in the months following the IPO.

Id. ¶¶ 40, 41.

Finally, the complaint also quotes the earnings conference call held in May 2017 to discuss the results of J.Jill's first fiscal quarter of 2017. Id. ¶ 43. Specifically, the complaint alleges that J.Jill "provided surprisingly conservative guidance for the remainder of the year . . . which implied a deceleration in the Company's sales growth." Id. ¶ 42. On the conference call, when an analyst asked about these conservative guidelines, Biese said, "I would tell you that we don't feel differently about the back half of the year . . . I don't see that there is anything different about the second half." Id. ¶ 43. The complaint alleges that this statement indicates the existence of adverse circumstances, that "these circumstances impacting the Company's business and prospects existed at the time of the IPO," and that "the Registration Statements did not accurately detail these facts." Id.

The Court considers each of the five omissions alleged in the complaint separately, as well as the statements by Biese in the May 2017 earnings conference call. Furthermore, the Court also considers the alleged omissions together with Biese's statements, to determine whether, if taken collectively, the complaint alleges an actionable violation of § 11 or § 12(a)(2).

A.  May 31 Earnings Call

The complaint alleges that Biese's statements in the May 31 earnings call are indicative of "circumstances impacting the Company's business and prospects" which "existed at the time of the IPO," but which "the Registration Statements did not accurately detail." Doc. No. 40 ¶ 43. In support, the plaintiff points to J.Jill's lower than expected performance, as reported on the August 29 and October 11 earnings calls, including decreasing gross margins, increasing promotional activities, and additional store closures. Id. ¶¶ 44-47. The plaintiff argues that

8

Biese's statements on the May 31 earnings call support the inference that as of May 31, J.Jill "had effectively admitted that these problems already existed at the time of the IPO." Doc. No. 53 at 21.

However, the statements offered in the complaint do not reasonably support such an inference. Nor does Biese's full answer, especially when considered in context of the call as a whole. The entire question and answer of the earnings call to which the plaintiff refers in the complaint is as follows:

> **Michael Charles Binetti** *UBS Investment Bank, Research Division*: Okay. And if I could sneak one more in. Around the IPO, we got a lot of details from you guys through the model and how to think about the business. And obviously, you've got your public company go-forward metrics that you're going to speak to us from. But as we kind of look at the good delivery in the first quarter, the nice guidance for the second quarter and where you've pointed us to for the year, it kind of leaves the back half of the year part of the puzzle lower than what we spoke to -- lower than what you spoke to when you gave us the components during the IPO. So I was just wondering if anything has changed or if you just -- I mean, it's obviously a nice problem to have, have less pressure on your second half. But I'm wondering if anything has changed on how you're looking at the back half of the year, since that's all we probably focus on when we talk to you guys in 90 days.
>
> **David Biese** *Chief Financial Officer and Senior Vice President*: I would tell you that we don't feel differently about the back half of the year. I acknowledge the math isn't perfect when you get in the low end of the sales range. But we're very comfortable with where we're guiding. I don't see that there is anything different about the second half and how we're feeling about it. And our cadence will be obviously, when we get to this call, at the end of the second quarter, we'll be able to update you with our thoughts on the third quarter and the balance of the year.
>
> **Paula Bennett** *Chief Executive Officer, President and Director*: And I think the fact that we have driven such strong store performance, as Dave said, given the competitive environment, we're just being prudent with our guidance.

Doc. No. 57-1 at 14. Nothing here plausibly supports the inference that CFO Biese was stating that the then-existing conditions causing the projection for the second quarter existed at the time of the IPO. Indeed, a few questions earlier, the following telling exchange occurred, providing additional context for Biese's statements:

9

> **Kate Bridget Fitzsimons** *RBC Capital Markets, LLC, Research Division*: This is Kate on for Brian. I guess my question would be on the gross margin outlook here for 2Q and also for the rest of the year. Just given the strength that you saw in the latter half of Q1, what's changing here in 2Q to result in the flattish outlook -- flat to slightly down outlook here in 2Q? And then also, how we should think about it for the back half of the year, just given the strength we saw here in Q1?
>
> **David Biese** *Chief Financial Officer and Senior Vice President*: There is nothing I can point to that is structural that says that we necessarily expect to see that margins are going to go down. What I would -- in the second quarter that is. What I would point to is first off, we have 1 quarter on the belt, we are very pleased with it. But I think given the environment, we would -- we think it's right to position ourselves right now against what was the strongest quarter of last year by expecting potentially that given the environment, it's flat to slightly down. We just think that's the right place to position it. As we think about the balance of the year, and this is true of the whole year, then we would expect our margin to be roughly flat year-over-year and that would be the case for the second half.

Id. at 11. Nothing about Biese's statements indicate that he is admitting J.Jill knew about existing risks, problems, or uncertainties at the date of the IPO which it failed to disclose or otherwise misled investors about. Indeed, there is nothing about the rest of the earnings call which indicates anyone present on the call understood his statements to indicate what the plaintiff suggests they do. At most, the call suggests what the executives said expressly, that in light of then-current adverse general economic conditions, they were providing cautious guidance for the remainder of the year.

In addition, the complaint alleges no facts which could support the assertion that Biese's statements on the May 31 earnings call gave rise to the inference the plaintiff asks the Court to draw. In reality, the facts suggest the opposite. The day before the earnings call, May 30, 2017, J.Jill's stock price closed at $11.27.[2] The day of the earnings call, at which time the plaintiff

---

[2] The Court takes judicial notice of J.Jill's stock price from May 30 through August 10, 2017. As J.Jill "common stock is publicly traded on NASDAQ, its stock price 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" Wang Yan v. ReWalk Robotics Ltd., No. CV 17-10169-FDS, 2018 WL 4039357, at *4 (D. Mass. Aug. 23, 2018).

10

argues that Biese revealed J.Jill's knowledge of the problems in existence at the time of the IPO, the stock price closed at $12.75. As defendants note, J.Jill's "stock closed above $11.27 (the price at which it closed the day prior to the earnings call) every single day until August 10, 2017 (when it closed at $11.22)." Doc. No. 56 at 12. Neither the express statements made in the earnings call nor the facts of which the Court may take judicial notice (nor other non-conclusory allegations) supports the interpretation of the earnings call for which the plaintiff argues.

The plaintiff points to two more circumstances which it argues augment its claims. First, the plaintiff points to the timing of various events with respect to the date of the IPO. In terms of the May 31 earnings call, which was just under three months after the IPO, the plaintiff argues that the proximity in time between the IPO and the call permit the Court to draw the inference previously discussed. In terms of the August earnings call, which discussed the results of the first full quarter after the IPO, the plaintiff notes that J.Jill reported negative results. The plaintiff argues that the timing of these two calls with respect to the IPO gives rise to the inference that there were known uncertainties which J.Jill failed to disclose at the time of the IPO which negatively affected its performance in the second quarter. In this case, no such inference arises. The IPO occurred two-thirds of the way through the first quarter. The results of that quarter were indisputably positive. Without more (and there is not more), adverse results in the second quarter, which were fully revealed and discussed on the mid-quarter call, support only the inference that these problems arose in the second quarter.

In addition, the plaintiff points to the fact that TowerBrook purchased J.Jill for $396 million, Doc. No. 40 ¶ 18, increased J.Jill's long-term debt to $274 million, id. ¶ 23, and then reaped the entire benefit of the IPO. These facts, the plaintiff argues, indicate that TowerBrook knew of uncertainties at the time of the IPO which it failed to disclose in either the Registration

Statement or the Prospectus. However, these facts give rise only to the possibility that TowerBrook may have known of such uncertainties, not to a plausible inference that it did.

Accordingly, the statements do not support the conclusion that defendants made untrue statements or omissions at the time of the Registration Statement and Prospectus and therefore they do not give rise to an actionable § 11 or § 12(a)(2) violation.

B.  Alleged Untrue Statements of Material Fact

The complaint alleges that the Registration Statement and Prospectus "created the misleading impression that the Company's unique business strategy had insulated it from adverse industry trends and, as a result, J.Jill would be able to continue to grow its gross profits." Doc. No. 40 ¶ 28. Such statements include: "we believe we will continue to drive profitable growth over time," "[w]e have established a solid foundation to support long-term, sustainable growth," "we believe our customer-focused strategy, foundational investments and data insights have resulted in consistent, profitable growth and industry-leading Adjusted EBITDA margins," "[we have] created significant brand trust and an emotional connection with [our] customers that [we] believe will facilitate sustainable sales growth and market share gains over time," and "[w]e believe we will continue to develop long-term customer relationships that will drive profitable sales growth." Id. ¶¶ 28-30.

However, "[a] plaintiff may not plead 'fraud by hindsight'; i.e., a complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 62 (1st Cir. 2008) (quoting Shaw, 82 F.3d at 1223); see also Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 457 (1st Cir. 2017) ("'fraud by hindsight' does not satisfy the pleading requirements in a securities fraud case"); Ezra Charitable Tr. v. Tyco Int'l, Ltd., 466 F.3d 1, 6

(1st Cir. 2006) ("Pleading 'fraud by hindsight,' essentially making general allegations that defendants knew earlier what later turned out badly, is not sufficient.") (internal quotation marks and citation omitted). "There is nothing in the amended complaint supporting the conclusion that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable, if they were unreasonable." Advest, 512 F.3d at 62.

Additionally, a number of the statements cited in the complaint (particularly those prefaced with "we believe") are properly considered opinion statements, which only give rise to § 11 liability under three narrowly defined circumstances. Omnicare, 135 S. Ct. at 1327-29. The plaintiff does not allege that J.Jill did not sincerely hold the beliefs professed in the statements; in fact, the complaint specifically rejects the proposition that J.Jill lied. Doc. No. 40 ¶ 57 ("Plaintiff does not allege that the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent."). The plaintiff also does not allege that any of the supporting facts in the Registration Statement were untrue, such that they would make the accompanying opinion statements misleading.

However, the complaint does allege that none of the defendants "made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading." Id. ¶ 61. As the Court held in Omnicare, the plaintiff

> must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.

135 S. Ct. at 1332. A blanket conclusory assertion that no investigation occurred, without more, is insufficient. Morales-Cruz v. Univ. of Puerto Rico, 676 F.3d 220, 224 (1st Cir. 2012) ("[T]he court must separate the complaint's factual allegations (which must be accepted as true) from its

conclusory legal allegations (which need not be credited).")." The plaintiff has identified no particular and material facts relating to the inquiry J.Jill purportedly did not conduct. Nor has the plaintiff identified any particular and material facts relating to the knowledge J.Jill purportedly had which would make the Registration Statement and Prospectus misleading to a reasonable person. Consequently, the statements cited in the complaint are statements of opinion which do not give rise to § 11 liability. Thus, plaintiff has not alleged sufficient facts to state a plausible claim for relief under § 11 or § 12(a)(2) on the basis of untrue material statements in the Registration Statement or Prospectus.

    C.    <u>Alleged Material Omissions</u>

The Court considers each of the plaintiff's five alleged omissions in turn. First, the plaintiff alleges that the Registration Statement fails to disclose "that J.Jill's purportedly unique and superior sales and marketing approach had not insulated the Company from adverse trends affecting the overall retail industry." Id. ¶ 27. However, multiple statements in the 22 page "Risk Factors" section of the Registration Statement belie this claim.

> Our business is sensitive to economic conditions and consumer spending . . . The retail industry is cyclical and consumer purchases of discretionary retail items, including our merchandise, generally decline during recessionary periods and other times when disposable income is lower. Factors impacting discretionary consumer spending include general economic conditions . . . and other macroeconomic factors . . . It is difficult to predict when or for how long any of these conditions can affect our business and a prolonged economic downturn could have a material adverse effect on our business, financial condition and results of operations.
>
> Our inability to anticipate and respond to changing customer preferences and shifts in fashion and industry trends in a timely manner could have a material adverse effect on our business, financial condition and results of operations . . . Failure to respond to changing customer preferences and fashion trends could also negatively impact our brand image with our customers and result in diminished brand loyalty.
>
> Competitive pressures from other retailers as well as adverse structural developments in the retail sector may have a material adverse effect on our business, financial condition, and results of operations . . . The women's apparel

> industry is highly competitive . . . We face a variety of competitive challenges, including price pressure, anticipating and quickly responding to changing customer demands or preferences, maintaining favorable brand recognition and effectively marketing our merchandise . . . Furthermore, many of our competitors have advantages over us, including substantially greater financial, marketing and other resources.

Doc. No. 45-1 at 17, 18.

Second, plaintiff alleges that the Registration Statement fails to disclose "that J.Jill's historic gross margin growth was not sustainable and would not continue, as it relied on revenues from shipping fees, increased promotional efforts and other short-term boosts to revenues." Doc. No. 40 ¶ 27. Again, the Registration Statement itself demonstrates this is not so.

> In recessionary periods and other periods where disposable income is adversely affected, we may have to increase the number of promotional sales or otherwise dispose of inventory for which we have previously paid to manufacture, which could further adversely affect our profitability.
>
> [O]ur failure to anticipate, identify or react appropriately in a timely manner to changes in customer preferences, tastes and trends and economic conditions could lead to, among other things . . . markdowns and write-offs . . .
>
> Competitive pricing pressures with respect to shipping our merchandise to our customers may harm our business and results of operations . . . To remain competitive, we may be required to offer discounted, free or other more competitive shipping options . . .

Doc. No. 45-1 at 17, 22. Additionally, the plaintiff's assertion that J.Jill should have disclosed that its "historic gross margin growth was not sustainable and would not continue," Doc. No. 40 ¶ 27, is a "fraud by hindsight" argument which cannot serve as the basis for liability without more.

Third, the plaintiff alleges J.Jill failed to disclose "that the Company was carrying increasing amounts of slow moving inventory and would need to significantly mark down sales items and increase promotional efforts in an attempt to continue its sales growth." Id. Bare conclusory allegations such as the assertion that J.Jill had increasing amounts of slow-moving

15

inventory are not the type of factual allegations the Court need accept as true. Iqbal, 556 U.S. at 678. Moreover, J.Jill's Registration Statement specifically noted the risks that it would have excess inventory and that it might need to resort to promotional efforts.

> We enter into agreements to manufacture and purchase our merchandise well in advance of the applicable selling season and our failure to anticipate, identify or react appropriately in a timely manner to changes in customer preferences, tastes and trends and economic conditions could lead to, among other things, missed opportunities, excess inventory or inventory shortages, markdowns and write-offs, all of which could negatively impact our profitability. . .
>
> Our inability to manage our inventory levels and merchandise mix, including with respect to our omni-channel retail operations, could have a material adverse effect on our business, financial condition and results of operations . . . Customer demand is difficult to predict and the lead times required for a substantial portion of our merchandise make it challenging to respond quickly to changes . . . Inventory levels in excess of customer demand may result in lower than planned profitability.
>
> Reductions in the volume of mall traffic or the closing of shopping malls as a result of changing economic conditions or demographic patterns could significantly reduce our sales and leave us with unsold inventory.

Doc. No. 45-1 at 17, 18, 25.

Fourth, the plaintiff alleges that J.Jill's Registration Statement failed to disclose "that the Company's brick-and-mortar stores were failing, as they were experiencing difficulty attracting customers and maintaining profitability, which would result in the Company shuttering up to eight stores in fiscal year 2017, with the rate of store closures accelerating." Doc. No. 40 ¶ 27. However, the "Prospectus Summary" portion of the Registration Statement specifically says that J.Jill "plan[ned] to selectively close underperforming stores on an annual basis, including one in 2016." Doc. No. 45-1 at 5. Additionally, the "Risk Factors" section included the following disclosures:

> We lease all of our store locations, our corporate headquarters and our distribution and customer contact center . . . If our business does not generate sufficient cash flow from operating activities to fund these expenses, we may not be able to service our lease expenses, which could materially harm our business. In the future, we

16

> may not be able to negotiate favorable lease terms. Our inability to do so may . . . force us to close stores in desirable locations. If we are unable to renew our store leases, we may be forced to close or relocate a store . . . Closing a store, even for a brief period of time to permit relocation, would reduce the revenue contribution of that store.
>
> Our growth strategy depends in part on our ability to open and operate new retail stores on a profitable basis . . . There can be no assurances that we will be able to achieve our store expansion goals . . . If our stores fail to achieve, or are unable to sustain, acceptable revenue, profitability and cash flow levels, we may incur . . . significant costs associated with closing those stores . . .

Id. at 20, 21. This purported omission also crosses the line into a "fraud by hindsight" analysis. The plaintiff asserts J.Jill should have disclosed that its rate of store closures would accelerate over the next year. Without any facts to support the contention that J.Jill knew at the time of the IPO that this would happen, this claim amounts to nothing more than a "fraud by hindsight" argument, especially since J.Jill disclosed its plans to close some stores and the risks that might require it to close more.

Finally, the plaintiff alleges that J.Jill should have disclosed that its "business, prospects and ability to service its long-term debt had been materially impaired." Doc. No 40 ¶ 27. That assertion assumes a fact not pled plausibly in the Complaint; that at the time of the two disclosures J.Jill's ability to service its debt was then materially impaired. The plaintiff provides no facts to support the allegation that J.Jill's "business, prospects and ability to service its long-term debt" had in fact "been materially impaired." Id. There are no facts alleged in the complaint which indicate the plausibility of this assertion, and without more, this type of conclusory statement is insufficient to plausibly plead a claim for relief.

Accordingly, the plaintiff has not alleged facts which state a plausible claim for relief under § 11 or § 12(a)(2) on the basis of material omissions in the Registration Statement or Prospectus.

D.  Collective Allegations in Complaint

Finally, the Court considers Biese's statements on the May 31 earnings call collectively with the Registration Statement, Prospectus, and alleged material omissions. Even so, the plaintiff has not alleged facts sufficient "to state a claim to relief that is plausible on its face." Iqbal, 556 U.S. at 678 (internal quotation omitted).[3]

E.  Section 15 Claim

The complaint asserts a claim against the Company Defendants on the basis of § 15 of the Securities Act of 1933, 15 U.S.C. § 77(o). Doc. No. 40 ¶ 75. Section 15 imposes liability on "[e]very person who . . . controls any person liable under sections 77k or 77l," which are § 11 and § 12(a)(2) of the Securities Act, respectively. 15 U.S.C. § 77(o). Without an underlying violation of either § 11 or § 12(a)(2) pled, and there is none pled here, there is no liability under § 15. See Cooperman v. Individual, Inc., 171 F.3d 43, 52 (1st Cir. 1999) ("A necessary element of a § 15 claim is a primary violation of § 11. Because the plaintiff has failed to state a claim for such a primary violation, they have also failed to state a claim under § 15."). Accordingly, the plaintiff has not stated a plausible claim for relief under § 15.[4]

---

[3] In their motion to dismiss, the Underwriter Defendants argue that "Plaintiff has failed to plead adequately an essential element of its § 12(a)(2) claim known as 'statutory standing' because it does not allege that it bought its shares from one of the Underwriter Defendants directly in the IPO." Doc. No. 47 at 5. However, because the plaintiff has not plausibly pled a claim for relief even if it had statutory standing, the Court declines to reach the question of whether the plaintiff has statutory standing under § 12(a)(2).

[4] The plaintiff seeks leave to amend the complaint, "[s]hould the Court find [it] to be deficient in any respect," citing the language of Rule 15 that leave to amend is to be freely given. Doc. No. 53 at 44 n.94. However, the complaint before the Court on these motions to dismiss is already the plaintiff's second complaint. Additionally, in the seven months the motions have been pending, the plaintiff has not submitted a proposed second amended complaint nor has plaintiff explained how amending the complaint again would address the issues raised by Defendants' motions to dismiss. Therefore, the request for leave to amend is denied.

IV.     CONCLUSION

For the foregoing reasons, both motions to dismiss, Docs. No. 44, 46, are ALLOWED. The Clerk shall enter judgment in favor of Defendants and against Plaintiff on all claims, pursuant to this Order, with each side to bear its own fees and costs.

                                            SO ORDERED.

                                            /s/ Leo T. Sorokin
                                            Leo T. Sorokin
                                            United States District Judge